## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SALVATORE TAGLIARENI, DERIVATIVELY ON BEHALF OF FEDEX CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> DAVID J. BRONCZEK, DAVID L. CUNNINGHAM, DONALD F. COLLERAN, JOHN A. EDWARDSON, MARVIN R. ELLISON, ALAN B. GRAF JR., SHIRLEY ANN JACKSON, BRAD MARTIN, JOSHUA COOPER RAMO, SUSAN C. SCHWAB, FREDERICK W. SMITH, DAVID P. STEINER, RAJESH SUBRAMANIAM, PAUL S. WALSH, MICHAEL C. LENZ, KIMBERLY A. JABAL, JAMES L. BARKSDALE AND JOHN C. INGLIS, <br><br> Defendants, <br><br> -and- <br><br> FEDEX CORPORATION, <br><br> Nominal Defendant. | C.A. No. _____ |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Salvatore Tagliareni ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Stockholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant FedEx Corporation ("FedEx" or the "Company") against certain present and former members of its Board of Directors (the "Board") and officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment from at least 2017 to 2018 (the

"Relevant Period") and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation: (a) review and analysis of public filings made by FedEx with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by FedEx,; (c) review of news articles, concerning the underlying issues; (d) review of the pleadings in *Rhode Island Laborers' Pension Fund v. FedEx Corporation,* 19-cv-05990 (S.D.N.Y.) and *Selwyn Karp v. FedEx Corporation*, 19-cv-06183(S.D.N.Y.); and (e) review of other publicly available information concerning FedEx and the Defendants.

## NATURE OF THE ACTION

1.      According to its public filings, FedEx is the parent holding company through which a broad portfolio of transportation, e-commerce and business services are provided through companies competing collectively, operating independently and managed collaboratively, under the respected FedEx brand. These companies include FedEx Ground Package System, Inc. ("FedEx Ground"), and Federal Express Corp. ("FedEx Express").[1]

## BACKGROUND OF THE ACTION

2.      In July 2016, FedEx significantly expanded its international operations through its $4.8 billion acquisition of TNT Express N.V. ("TNT"), a Netherlands-based logistics company with operations concentrated in Europe. To date, this has been the largest acquisition in FedEx

---

[1] For purposes of this Complaint, FedEx and its subsidiaries (including "FedEx Ground" and "FedEx Express") will sometimes collectively be referred to simply as "FedEx."

history. This acquisition instantly added billions of dollars of European revenues to FedEx's topline and increased the Company's international revenue mix from 24% in fiscal year 2016 to 33% in fiscal year 2017.

3.        After the acquisition closed, FedEx embarked on an aggressive strategy to integrate its legacy European operations with TNT. On March 31, 2017, nine months after completing the acquisition, FedEx issued a three-year operating income improvement target for investors to gauge and track the purported benefits of the TNT acquisition and FedEx's integration efforts. Specifically, the Company stated that, in fiscal year 2020, its integration with TNT would result in a $1.2 billion to $1.5 billion operating income improvement above its fiscal year 2017 reported operating income (the "TNT Income Improvement Target").

4.        On June 27, 2017, however, TNT's operations were crippled by a cyberattack known as NotPetya, which involved the spread of a malware virus throughout TNT's systems (the "Cyberattack"). NotPetya is considered one of the largest cyberattacks in history, having affected a multitude of companies on a global scale. The timing of the attack was particularly problematic for FedEx, as TNT's systems were paralyzed during the critical period involving the integration of TNT with the Company's legacy European operations.

5.        On September 19, 2017, FedEx reported that the Cyberattack had negatively impacted its first quarter 2018 results (ended August 30, 2017).

6.        During the related earnings call, however, Defendants assured investors that **all critical** TNT systems were fully restored and fixes to its customer-specific systems were expected to be finalized by the end of September 2017. Company executives also reaffirmed the TNT Income Improvement Target. Analysts maintained their ratings and price targets on FedEx stock due to the Company's assurances about its recovery from the Cyberattack. On this news, FedEx

3

stock increased $4.50 per share, or roughly 2.1%, to close at $220.50 per share on September 20, 2017.

7.      Following the September 19, 2017 report, Defendants continually assured investors about its recovery from the Cyberattack and that any negative impact from the attack was minimal. For example, Defendants told investors that TNT customer volumes were being restored to pre-attack levels and that "despite the cyberattack, the customers stuck with us." Defendants also stated that TNT integration efforts were successfully progressing and continuously stated that FedEx was "on track" to achieve the TNT Income Improvement Target.

8.      Notwithstanding these positive representations to the market, certain Defendants made materially false and misleading statements and/or failed to disclose that: (i) TNT's overall package volume growth was slowing as TNT's large customers permanently took their business to competitors after the Cyberattack; (ii) as a result of the customer attrition, TNT was experiencing an increased shift in product mix from higher-margin parcel services to lower-margin freight services; (iii) the anticipated costs and timeframe to integrate and restore the TNT network were significantly larger and longer than disclosed; (iv) FedEx was not on track to achieve the TNT The truth about TNT's deteriorating business was eventually revealed through a series of disclosures; and as a result of these undisclosed negative trends and cost issues, FedEx's positive statements about TNT's recovery from the Cyberattack, integration into FedEx's legacy operations, customer mix, customer service levels, profitability, and prospects lacked a reasonable basis.

9.      While making disclosures, however, Defendants continued to assure investors that FedEx would still meet the TNT Income Improvement Target, and that TNT had successfully recovered in the wake of the Cyberattack.

4

10.     On June 19, 2018, FedEx provided a disappointing capital expenditure outlook for its FedEx Express segment, the reporting segment that includes TNT's results, and reported higher-than-expected TNT integration expenses. On this news, FedEx shares dropped $6.96 per share, or 2.69%, to close at $251.43 per share on June 20, 2018. Despite these issues, Defendants assured investors that the Company was "on track" to meet the TNT Income Improvement Target, and that TNT's year-over-year growth had resumed.

11.     On September 17, 2018, FedEx reported lower-than-expected earnings for its first quarter ended August 30, 2018. The Company partially attributed these results to higher-than expected TNT integration costs. On this news, FedEx stock dropped $14.15 per share, or 5.5%, to close at $241.58 per share on September 18, 2018. Defendants, however, again assured investors that the Company was on track to meet the TNT Income Improvement Target, and touted that the Company's "strong international volume growth reflect[ed] [FedEx's] recovery from the TNT cyberattack."

12.     On December 7, 2018, FedEx announced that David L. Cunningham would retire as FedEx Express' President and Chief Executive Officer ("CEO") on December 31, 2018.

13.     Analysts immediately suggested that Cunningham's "retirement" was a result of performance issues within the Company's FedEx Express segment. On this news, FedEx stock dropped $13.67 per share, or roughly 6.4%, to close at $201.39 per share on December 7, 2018.

14.     The full extent of TNT's deteriorating business was revealed to investors on December 18, 2018 after the close of trading. On that date, FedEx reported a large profit miss for its second fiscal quarter ended November 30, 2018. Defendants attributed the disappointing results to lower package volumes in Europe and a negative shift in TNT's product mix to lower margin freight business following the Cyberattack, which had occurred well-over a year ago.

15.     The Company also lowered its fiscal 2019 earnings guidance and announced that the TNT Income Improvement Target would no longer be achievable by fiscal year 2020.

16.     On this news, FedEx stock dropped $22.50 per share, or roughly 12.2%, to close at $162.51 per share on December 19, 2018.

17.     The materially false and misleading statements above and others, including those contained in various proxy statements, as set forth below, made by the Defendants, caused the market price for FedEx common stock to be artificially inflated.  Investors lost money when the truth was disclosed and the artificial inflation came out of the stock. Due to the precipitous decline in the market value of the Company's common stock, certain investors brought securities class actions against FedEx and certain of its officers and directors, which is resulting in significant harm to FedEx and its shareholders.

## **JURISDICTION**

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because one of Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.   This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     Venue is proper in this District because the Company conducted business in this District, and its stock trades on the New York Stock Exchange in this District.

## PARTIES

21.     Plaintiff is a current stockholder of FedEx and has continuously held FedEx stock since 1994.

22.     Nominal Defendant FedEx was incorporated in Delaware on October 2, 1997 to serve as the parent holding company and provide strategic direction to the FedEx portfolio of companies.

23.     Defendant David ("Bronczek"), was at all relevant times the Company's Chief Operating Officer ("COO") and President.  While the Company's stock price was artificially inflated, Bronczek, on January 2, 2018 sold 46,555 shares of FedEx common stock at a price of $225.50 per share and received proceeds of $11,894,261.  At the time of the sale he had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale.

24.     Defendant David L. Cunningham ("Cunningham"), was at all relevant times President and CEO of FedEx Express.

25.      Defendant Donald F. Colleran ("Colleran"), was at all relevant times the Company's Chief Sales Officer and Executive Vice President.   While the Company's stock price was artificially inflated, Colleran, on September 21, 2017 sold 10,000 shares of FedEx common stock at a price of $220 per share and received proceeds of $2,200,002.  At the time of the sale he had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale.

26.     Defendant John A. Edwardson ("Edwardson"), has served as a director of the Company since 2003. While the Company's stock price was artificially inflated, Edwardson, on September 19, 2018, sold 1,160 shares of FedEx common stock at a price of $242.30 per share and received proceeds of $281,124.  At the time of the sale he had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale.

27.     Defendant Marvin R. Ellison ("Ellison"), has served as a director of the Company since 2014.  In addition, defendant Ellison also served as a member of the Board's Compensation Committee (the "Compensation Committee"), the IT Oversight Committee, and the Governance Committee during the Relevant Period.

28.     Defendant Alan B. Graf Jr. ("Graf"), has served as the Company's Chief Financial Officer since 1998.  While the Company's stock price was artificially inflated, Graf, on December 21, 2017 sold 24,100 shares of FedEx common stock at a price of $249.40 per share and received proceeds of $6,011,093.   At the time of the sale he had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale.

29.     Defendant Kimberly A. Jabal ("Jabal"), has served as a director of the Company since 2013. In addition, defendant Jabal served as a member of the Audit Committee and IT Oversight Committee during the relevant period.  While the Company's stock price was artificially inflated, Graf, on November 1, 2017 sold 3,980 shares of FedEx common stock at a price of $225.60 per share and received proceeds of $897,703.  At the time of the sale she had insider

information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale.

30.     Defendant Shirley Ann Jackson ("Jackson"), has served as a director of the Company since 1999. In addition, defendant Jackson served as a member of the Audit Committee, Compensation Committee, and Governance Committee during the relevant period. While the Company's stock price was artificially inflated, Jackson, on November 2, 2017 sold 3,730 shares of FedEx common stock at a price of $225.70 per share and received proceeds of $841,860.  At the time of the sale she had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale.

31.     Defendant R. Brad Martin ("Martin"), has served as a director of the Company since 2011.  In addition, defendant Martin served as a member of the Audit Committee and Governance Committee during the Relevant Period.

32.     Defendant Joshua Cooper Ramo ("Ramo"), has served as a director of the Company since 2011. In addition, defendant Ramo served as a member of the Audit Committee and IT Oversight Committee during the relevant period.

33.     Defendant Susan C. Schwab ("Schwab"), has served as a director of the Company since 2009. In addition, defendant Schwab served as a member of the Compensation Committee and IT Oversight Committee during the relevant period.

34.     Defendant Frederick W. Smith ("Smith"), the founder of the Company, has served as a director, Chairman of the Board and CEO of the Company since 1998 and as Chairman of FedEx Express since 1975. Previously, Defendant Smith served as the President of the Company

from 1998 to 2017, as a director, Chairman of the Board, President and CEO of FedEx Express from 1983 to 1998, as CEO of FedEx Express from 1977 to 1998, and as President of FedEx Express from 1971 to 1975.  While the Company's stock price was artificially inflated, Smith, on April 18, 2018 sold 124,000 shares of FedEx common stock at a price of $256.00 per share and received proceeds of $841,860.  At the time of the sale he had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale.

35.      Defendant David P. Steiner ("Steiner"), has served as a director of the Company since 2009. In addition, defendant Steiner served as the Chair of the Governance Committee during the relevant period. Defendant Steiner is also the Board's Lead Independent Director. While the Company's stock price was artificially inflated, Steiner, on January 5, 2018 sold 3,016 shares of FedEx common stock at a price of $26625.70 per share and received proceeds of $802,405.  At the time of the sale he had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale.

36.      Defendant Rajesh Subramaniam ("Subramaniam"), was at all relevant times the Company's Chief Marketing and Communications Officer and Executive Vice President during the relevant period.  While the Company's stock price was artificially inflated, Subramaniam, on September 21, 2017 sold 6,750 shares of FedEx common stock at a price of $219.60 per share and received proceeds of $1,482,401.  At the time of the sale he had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal

controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale.

37.      Defendant Paul S. Walsh ("Walsh"), has served as a director of the Company since 1996. In addition, defendant Walsh served as the Chair of the Compensation Committee during the relevant period.  While the Company's stock price was artificially inflated, Walsh, on April 18, 2018 sold 4,400 shares of FedEx common stock at a price of $255 per share and received proceeds of $1,122,000.   At the time of the sale he had insider information regarding the Company's market manipulation, materially false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially-inflated prices at the time of his stock sale.

38.      Defendant Michael C. Lenz ("Lenz") was the Company's Treasurer and Corporate Vice President during the relevant period.

39.      James L. Barksdale ("Barksdale") worked for FedEx for 13 years from 1979 to 1992, serving as chief information officer, then executive vice president and chief operation officer. He was a director up until his retirement immediately before the 2018 annual meeting. .Barksdale served on the IT Oversight Committee during the Relevant Period.

40.      John C. Inglis ("Inglis") has been as a Director since 2015. He has served as Chairman of the IT Oversight Committee and a member of compensation and nominating and governance committees, during the relevant period.

41.      Collectively, defendants Bronczek, Colleran, Cunningham, Edwardson, Ellison, Graf, Jabal, Jackson, Martin, Ramo, Schwab, F. Smith, Steiner, Subramaniam, Walsh, Lenz, Barksdale and Inglis shall collectively be referred to herein as "Defendants."

42.     Defendants Edwardson, Ellison, Jabal, Jackson, Martin, Ramo, Smith, Steiner, Walsh, Barksdale and Inglis shall collectively be referred to as the "Director Defendants."

43.     Defendants Edwardson, Graf, Jackson, Smith, Steiner, Walsh, Bronczek, Subramaniam, Colleran are collectively referred to herein as the "Insider Selling Defendants."

44.     Defendants Barksdale, Inglis, Ellison, Griffith, Jabal, Ramo and Schwab are collectively referred to as the "IT Oversight Committee Defendants."

45.     Defendants Edwardson, Graf, Jabal, Smith, Steiner, Walsh, Bronczek, Subramaniam and Colleran are collectively referred to as the "Insider Trading Defendants."

46.     Defendants Edwardson, Smith, Steiner, Jabal and Walsh are collectively referred to as the "Insider Trading Director Defendants."

## <u>DEFENDANTS' DUTIES</u>

47.     By reason of their positions as officers, directors, and/or fiduciaries of FedEx and because of their ability to control the business and corporate affairs of FedEx, Defendants owed FedEx and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were and those who still serve as directors or officers, are required to use their utmost ability to control and manage FedEx in a fair, just, honest, and equitable manner. Defendants were and are, as to those who still serve as directors or officers, required to act in furtherance of the best interests of FedEx and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to FedEx and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

48.     Defendants, because of their positions of control and authority as directors and/or officers of FedEx, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with FedEx, each of the Defendants had knowledge of material non-public information regarding the Company.

49.     To discharge their duties, the officers and directors of FedEx were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of FedEx were required to, among other things:

    a)  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of FedEx;

    b)  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority including ensuring that the Company met its obligations to make full and complete disclosure within the requirements of the Federal Securities laws.; and

    c)  When put on notice of that the Company's business practices and operations conflict with applicable federal and state laws, rules, regulations and requirements or contractual obligations, to exercise good faith in taking appropriate action so as to assure that the business practices will be corrected to eliminate the conflict, correct any misconduct and prevent its recurrence.

50.     The Defendants also have the obligation to refrain from trading in FedEx stock based on knowledge of adverse material non-public information.

51.     FedEx has established "Corporate Governance Guidelines," which state, *inter alia*:

13

### Basic Responsibilities of Board Members.

The fundamental responsibility of members of the Company's Board of Directors is to promote the best interests of the Company and its stockholders by overseeing the management of the Company's business and affairs. In doing so, Board members have two basic legal obligations to the Company and its stockholders: (a) the duty of care, which generally requires that Board members exercise appropriate diligence in making decisions and in overseeing management of the Company, and (b) the duty of loyalty, which generally requires that Board members make decisions based on the best interests of the Company and its stockholders and without regard to any personal interest.

### Board Risk Oversight.

The Board of Directors has ultimate responsibility for risk oversight. While management has day-to-day responsibility for assessing and managing the Company's risk exposure, the Board of Directors and its committees provide oversight in connection with those efforts, with particular focus on ensuring that the Company's risk management practices are adequate and regularly reviewing the most significant risks facing the Company. The Board of Directors has delegated to each of its committees responsibility for the oversight of specific risks that fall within the committee's areas of responsibility.

### Corporate Integrity and Compliance.

The Board of Directors is responsible for monitoring the Company's compliance with legal and regulatory requirements and overseeing the Company's corporate integrity and compliance programs. The Board has delegated much of this responsibility to the Audit Committee. In furtherance of this responsibility, the Audit Committee will periodically discuss the implementation and effectiveness of the Company's corporate integrity and compliance programs with the Company's Executive Vice President, General Counsel and Secretary and Corporate Vice President and Global Chief Compliance & Governance Officer. In addition, the Audit Committee will periodically review the Company's Code of Business Conduct and Ethics, which sets forth the basic ethical principles all Board members, officers, employees and contractors must follow, and recommend any proposed changes to the Board of Directors for approval.

52.     Further, the Company's IT Oversight Committee is specifically tasked with the Board's oversight responsibilities regarding information technology issues. The purpose of the IT Oversight Committee is governed by the IT Oversight Committee Charter, which states:

The purpose of the Information Technology Oversight Committee is to:

14

• Review major information technology ("IT")-related projects and technology architecture decisions;
• Assess whether the Company's IT programs effectively support the Company's business objectives and strategies;
• Assist Board oversight of cybersecurity risks and management efforts to monitor and mitigate those risks;
• Advise the Company's senior IT management team; and
• Advise the Board of Directors on IT-related matters.

53.     The IT Oversight Committee Charter states the responsibilities of the IT Oversight

Committee members as follows:

**Cybersecurity**

Review and discuss with management and the Board of Directors (i) the Company's cybersecurity risks and (ii) the steps management has taken to identify, assess and monitor those risks.

Review and discuss with management (i) technologies, policies, processes and practices for managing and mitigating cybersecurity risks and (ii) the Company's cyber-attack incident response and recovery plan.

**IT Disaster Recovery**

Review and discuss with management the Company's IT disaster recovery capabilities and contingency plans.

**Internal Controls**

Review and discuss with management the quality and effectiveness of IT systems and processes that relate to or affect the Company's internal control systems.

Review and discuss with management and the Board of Directors (i) the Company's IT-related compliance risks, including IT-related internal audits, and (ii) the steps management has taken to identify, assess, monitor, manage and mitigate those risks.

Periodically report to and consult with the Audit Committee of the Board of Directors regarding IT systems and processes that relate to or affect the Company's internal control systems.

**Advisory Role**

Advise the Company's senior IT management team.

15

Stay informed of, assess and advise the Company's senior IT management team with respect to new technologies, applications and systems that relate to or affect the Company's IT strategy or programs.

54.     In violation of the IT Oversight Committee Charter, and their general duties as members of the IT Oversight Committee, the IT Oversight Committee Defendants conducted little, if any, oversight of the Company's internal controls over the Company's IT matters, resulting in materially false and misleading statements regarding the Company's business, operational and compliance policies, and consciously disregarded their duties to monitor such controls. The IT Oversight Committee Defendants' complete failure to perform their duties in good faith resulted in misrepresentations to the SEC, the investing public, and the Company's shareholders.

## **SUBSTANTIVE ALLEGATIONS**

### A.  **Background**

55.     According to its public filings, FedEx provides a broad portfolio of transportation, e-commerce, and business services through companies competing collectively, operating independently, and managed collaboratively, under the respected FedEx brand. These companies are broken into various business segments; FedEx Express, FedEx Ground, FedEx Freight, and FedEx Services, among others. FedEx Express is the world's largest express transportation company, offering time- definite delivery to more than 220 countries and territories. FedEx Ground is a leading North American provider of small-package ground delivery services.  FedEx Freight is a leading North American provider of less-than-truckload freight services. FedEx Services provides sales, marketing, information technology, communication, customer service, technical support, billing and collection services, and certain back- offline functions that support FedEx's transportation segments.

**B.    Defendants' Misconduct**

56.    Defendants' misconduct consists of a series of materially misleading statements made by certain Defendants, who were senior members of management, and the failure of the Director Defendants to act in a way such that there would be controls over public statements made by management to the investing public to ensure that any such statements are materially complete and accurate and fully comply with the federal securities law.

57.    The misconduct starts on September 19, 2017, when FedEx reported its first quarter 2018 results for the quarter ended August 30, 2017. The Company's quarterly revenues and earnings missed analysts' estimates due to lost customer sales and remedial costs from the Cyberattack. Despite this near-term pressure at TNT, Defendants highlighted their recovery efforts from the Cyberattack and downplayed the lingering impacts on its business.

58.    For example, during the related earnings call on September 19, 2017, certain Defendants assured investors that ***all critical*** TNT systems were fully restored and fixes to its customer- specific systems were expected to be finalized by the end of September 2017. Company Executives also reaffirmed the TNT Income Improvement Target, stating in pertinent part: "***We're confident of our prospects for long-term profitable growth, and we reaffirm our commitment to improve operating income at FedEx Express segment by $1.2 billion to $1.5 billion in fiscal 2020 versus fiscal 2017.*** Our overall goals remain to increase earnings, cash flows, returns, and margins."[2]

59.    During the same call, Defendant Bronczek told investors that TNT service was at "pre-crisis levels," and that fixes to customer-specific solutions were expected to be finalized and restored by the end of September 2017 "just in time for peak shipping," stating in pertinent part:

---

[2] Emphasis added throughout, unless otherwise noted.

Given the discussion around the impact of the cyberattack on TNT, I thought it [was] very important to point out the underlying fundamentals of the FedEx Express business remain very strong.

In particular, International Export Package revenue for the segment grew 4% in the quarter after absorbing the impact of the cyberattack. And we have made significant progress on the recovery of the TNT business and IT systems.

\* \* \*

From a customer perspective, our teams are executing a detailed, thorough, and customer-focused plan, targeting and restoring customer volumes to our expected levels. This plan includes leveraging our senior officer team on sales calls to instill confidence with customers so that we can fully meet their expectations . . . .

***Our service levels within Europe have been restored to pre-crisis levels.*** And in August, this past month of 2017, our service levels were actually above those a year ago in August of 2016. Tremendous work by the operations team.

With strong service levels and operations returning to near-normal capabilities, our focus now shifts to finalizing the restoration of certain key customer-specific solutions and their systems. ***We expect these IT capabilities to be restored by the end of this month, enabling business-as-usual operations with full capabilities across all customer segments just in time for peak shipping***

60.     The day following the analyst call, FedEx stock increased $4.50 per share, or roughly 2.1%, to close at $220.50 per share.

61.     On December 19, 2017, FedEx reported positive results for its second fiscal quarter ended November 30, 2017. During FedEx's second quarter 2018 earnings call, Defendant Smith touted TNT's successful recovery from the Cyberattack, and stated the Company was "on target" to achieve the TNT Income Improvement Target, stating in pertinent part:

***We're very proud of the progress the FedEx team has made in recovering from the effects of the cyberattack at TNT.*** Let me express our appreciation to the thousands of FedEx professionals who worked around the clock and tirelessly to mitigate this unprecedented event. Dave will update you in his discussion of overall global operations.

We expect yield and volume growth at all of our transportation segments will support revenue and earnings growth in the second half of fiscal 2018. ***Our plans remain on target to improve operating income at the FedEx Express segment***

18

*by $1.2 billion to $1.5 billion in fiscal 2020 versus fiscal 2017* and our goal remains to increase earnings, margins, cash flows and returns and we are confident that we can do so.

62.     On the same call, Defendant Graf also stated that FedEx's international volumes had increased despite the Cyberattack, and also reaffirmed the TNT Income Improvement Target, stating in pertinent part:

> *Despite the challenges from the cyberattack, total international average package volume increased 5%.*
>
> *            *   *
>
> *We remain committed to our target of $1.2 billion to $1.5 billion in additional operating profit for the FedEx segment in FY 2020 versus FY 2017*, which includes TNT synergies as well as base business and other operational improvements across the entire global FedEx Express network.

63.     Likewise, Defendant Bronczek touted that TNT's service levels and operations were "back to normal," and that TNT's volumes and cost efficiencies were improving, stating in pertinent part:

> First, let me start off with FedEx Express. They grew their revenues and profits, as Alan just mentioned, despite the impact of the TNT Express cyberattack. *The underlying fundamentals of the business remain very strong with higher base rates and growth in the international package and freight services. Cost efficiencies are also improving.* For example, we continue to see higher aircraft fleet reliability, which increases our productivity.
>
> *I'm also very happy to say that at TNT, we are seeing strong service levels and operations are back to normal after the June cyberattack.*

64.     Following the above conference call and news, FedEx stock increased $8.53 per share, or 3.5%, to close at $251.07 per share on December 20, 2017.

65.     On March 20, 2018, FedEx reported positive results for its third fiscal quarter ended February 28, 2018. In addition, the Company raised its fiscal 2019 earnings forecast. During FedEx's third quarter 2018 earnings call, Defendant Graf reaffirmed the FedEx Express 2020 operating income target, stating in pertinent part: "As Fred mentioned, *we  remain committed to*

19

*our target of $1.2 billion to $1.5 billion in additional operating profit for the FedEx Express*

*segment in FY 2020 versus FY 2017*, which includes TNT synergies as well as base business and

other operational improvements across the global FedEx Express network."

66.     On that same date, Defendant Bronczek spoke regarding the TNT integration and

restoration of its service levels post-Cyberattack, stating in pertinent part:

> I also want to provide an update on our TNT integration. As you know, this was
> the most significant acquisition in our company's history, and dramatically
> improves our global capabilities and competitive posture. *I'm happy to say that, at
> TNT, we are seeing strong service levels, and the integration is accelerating. A
> key element of our acceleration plan was to enable the flow of packages between
> the legacy TNT and FedEx systems prior to full integration.* This allows us to
> direct volumes to the highest service, but the lowest cost networks. This capability
> is expected to be in place by May 31 of this year.

(Emphasis added).

67.     Finally, Defendant Smith addressed questions from certain analysts regarding

TNT's volumes post-Cyberattack, stating that TNT volumes were back to pre-Cyberattack levels:

> The second is from Jack Atkins of Stephens. To what degree was the June
> cyberattack at TNT negatively impact 3Q results, I guess, it did negatively
> impact 3Q results at Express, and would you expect any lingering impact in the
> fourth quarter? Now, I think these questions from Todd and Jack, and I'm going
> to ask again Dave and David Cunningham to amplify this, reflects a bit of a
> misunderstanding here, in that, please recall that when we started this fiscal
> year, we told you that we were no longer going to be talking about Express and
> TNT.

> So the numbers that are in the Express segment now are the combination of the
> two. So the reality is, the FedEx Express volumes are growing, *but the TNT
> volumes were adversely affected by NotPetya and we are now growing back up
> to where we would have been had this attack not happened*. And let me again
> give enormous thanks to our sales, our customer service and particularly our IT
> professionals that did the most unbelievable job of recovering from this attack,
> which the U.S. government now says was a government or a government-
> sanctioned attack on the Ukraine, and TNT was just a side victim of it.

> So the fourth quarter will - I think, began to show these at a more granular
> fashion. *But we're not seeing decline in Express traffic, in the fourth quarter
> we will have recovered most of the NotPetya volume from TNT now.*

(Emphasis added).

68.     Defendant Cunningham followed up on Defendant Smith's comments, touting the

"remarkable" recovery of TNT's business over the last five months, stating in pertinent part:

> Yeah, I'd just add a couple of comments to what Fred and Dave just said. I
> think, first thing you got to remember is the effects in Q3 were mostly one-off
> type of effects. Q4 ends up being a seasonally strong quarter and we've already
> told you what that's going to be. Our TNT network was fully restored and back
> to business as usual as of the end of 2017. ***The recovery of the business over
> the last five months has been remarkable. And given the value proposition of
> the TNT road networks, our freight volumes have been strong, and we are
> experiencing solid growth in these products.*** The cyberattack continues to have
> a lingering effect in the third quarter, and our existing customer base has not
> been fully restored - has not fully restored all volumes as they continue to gain
> confidence in our ability to provide service and recovery of our business. Our
> outstanding performance during peak is evidence of the strength of our network
> and our recovery and our sales teams are leveraging this in the fourth quarter,
> and growing and winning business.

(Emphasis added).

## THE TRUTH EMERGES

69.     On June 19, 2018, FedEx released its fourth quarter and full year 2018 results.

FedEx reported quarterly earnings and sales that met analyst estimates. Despite these results,

however, FedEx reported, among other things, higher-than-expected TNT integration expenses.

On this news, FedEx stock fell $6.96 per share, or 2.69%, to close at $251.43 per share on June 20,

2018.

70.     Regardless, Defendants continued to offer positive commentary on the TNT

integration and related financial performance metrics. During the earnings call that same day,

Defendant Bronczek made the following positive statements about the TNT integration while

reaffirming the TNT Income Improvement Target, stating in pertinent part: "***The successful***

*integration of TNT and FedEx Express remains a key driver of the FedEx Express FY 2020 operating income improvement target of $1.2 billion to $1.5 billion over FY 2017's results.*"

71.     On the same call, Defendant Cunningham discussed the Company's "remarkable" and "outstanding" recovery following the Cyberattack, stating in pertinent part:

> You can see in the results that we experienced year-over-year double-digit revenue growth in our international package and Freight Services this past quarter. While higher rates were certainly a major contributor, we're also seeing solid year-over-year growth in Freight traffic, a piece of our product portfolio that expanded significantly through the addition of TNT. ***Again, the recovery of the business over the past several months has been remarkable and we certainly owe major thanks to our sales, customer service, and IT professionals who've done an outstanding job of recovering from this attack.***

(Emphasis added).

72.     Finally, Defendant Colleran commented on business growth and "customer loyalty" within the FedEx Express segment, stating in pertinent part: "Just like to add a comment to that as well. We greatly appreciate the loyalty that our customers have shown us as we went through this difficult period. And as you noted, ***I'm also glad to mention that we resumed year-over-year growth in the impacted segments of that business***."

73.     On July 16, 2018, FedEx filed its Form 10-K with the Securities and Exchange Commission for its fiscal year ended May 31, 2018. Within the filing, FedEx stated that its FedEx Express segment revenues increased "***despite impacts from the NotPetya cyberattack***," and that international export package yields increased in part due to, among other reasons "***favorable service mix***."

74.     On September 17, 2018, FedEx released disappointing first quarter 2019 results. Defendants noted higher variable compensation accruals and accelerated wage increases for certain hourly employees which collectively, negatively affected year-over-year results by $170 million. On this news, FedEx stock fell $14.15 per share, or 5.5%, to close at $241.58 per share

on September 18, 2018 after the reporting earnings of $3.46 per share in its first fiscal quarter of 2019 vs. the $3.80 per share that analysts had expected. Despite these adverse results, Defendant Bronczek again reaffirmed the FedEx Express profit improvement guidance on the Company's related earnings call, stating in pertinent part: "*We are very confident in reaching the $1.2 billion to $1.5 billion of operating income improvement that Fred just talked about at FedEx Express in FY 2020 over FY 2017.*"

75.    Defendant Graf also reaffirmed the FedEx Express profit improvement guidance while partially disclosing the truth about how TNT was experiencing a negative service mix, stating in pertinent part:

> *While strong international volume growth reflects our recovery from the TNT cyberattack last year, the impact to operating income was partially offset by shifting service mix and the timing of variable compensation, aircraft maintenance and merit increases.*
>
> As we continue to grow package volume, our revenue and overall operating income will benefit. *We remain committed to achieving $1.2 billion to $1.5 billion in operating income improvement at Express.*

76.    Defendant Subramaniam then addressed analyst questions regarding "opportunities for share gains for the combined TNT/FedEx network," stating in pertinent part:

> Yeah Brian, clearly the opportunities are very large. As you all may know and TNT and now FedEx has a fantastic Ground network that handles parcels and pallets in Europe. And TNT is a key player for intra-Europe and Ground markets and key domestic markets in Europe, of course, don't forget that TNT also has a terrific Ground networks in Middle East in Asia and Latin America. So when we combine that with FedEx's unparalleled intercontinental air system, we have a unique network that allows us to offer new value to our customers in a very cost effective manner. And that opens up large international market segments in which we are now extremely well positioned to gain significant share.
>
> *And the good news here we are well on our way to unlocking the value and we are pleased with progress as Dave talked about. We are progressing well on the integration.* And customers are already beginning to see this value. And all I can say here is that the sales and marketing teams in the world are very

excited to be [sic] see the progress and really provide new value for our customers.

77. On September 20, 2018, news outlets reported that Michael Holt would retire as FedEx Express Europe's regional COO at the end of September 2018. Holt would be replaced by Sean Healy.

78. On September 24, 2018, during FedEx's Annual General Meeting with shareholders, Defendant Smith stated that the Company was "on track" to achieve the TNT Income Improvement Target. He further made positive statements regarding revenue growth at FedEx Express, as well as TNT service levels and integration efforts, stating in pertinent part:

> FedEx Express posted solid revenue growth and is on track to reach our target $1.2 billion to $1.5 billion improvements in operating income in fiscal 2020 versus 2017. *We can now report we're seeing strong TNT service levels and our integration of TNT is progressing rapidly.* Great thanks to the teams that worked around the clock and around the world to restore and better secure both the technology systems and our customers' trust in us. We're emerging from this huge challenge stronger than ever.

79. On November 7, 2018, during the Robert W. Baird Industrial Conference, Defendants continued to affirm the FedEx Express operating income guidance for 2020. For example, Defendant Lenz stated, in pertinent part:

> And as we get into the home stretch of completing the TNT integration here by May of 2020, that's going to drive tremendous value in terms of what we can leverage there, and that's a key element of the target we've got out there of improving our Express business' operating income by $1.2 billion to $1.5 billion in our fiscal year 2020 versus the fiscal year 2017 baseline.

80. At the same conference, Defendant Lenz discussed how TNT had retained customers in the wake of the Cyberattack, stating in pertinent part:

> One of the aspects of what gives us confidence in our value are the capabilities that the TNT assets will provide. And in particular, when you put them together with our unmatched global network is -so five, six years ago, UPS tried to acquire TNT and that was ultimately prohibited by regulatory authorities. Well, of course, we were in trying to take their customers along the way there amidst the disruption and uncertainty, and we couldn't take TNT's customers because they were loyal and

24

the value of what TNT was able to do was significant. Well, similarly now we're experiencing that as well that, despite the cyberattack, the customers stuck with us. So, that's what gives us the confidence and basis that, look, this is going to drive even value beyond the immediate of what we're targeting here in FY 2020.

81.     On December 7, 2018, FedEx surprised investors by announcing that on December 3, 2018, Defendant Cunningham had entered into a separation agreement with FedEx to retire by December 31, 2018 as the CEO of FedEx Express. Defendant Cunningham would be replaced by Defendant Subramaniam in that role. Analysts immediately suggested that Cunningham's "retirement" was a result of performance issues within the FedEx Express segment.

82.     On this news, FedEx stock dropped $13.67 per share, or 6.4%, to close at $201.39 per share on December 7, 2018.

83.     Finally, on December 18, 2018, after the close of trading, FedEx released weak results for its second quarter 2019. Among other things, FedEx lowered its fiscal 2019 outlook and told investors that the TNT Income Improvement Target would no longer be achievable by the end of fiscal 2020. During the related earnings call held that evening, Defendant Bronczek attributed these changes to lower package volumes in Europe and stated that "[f]ollowing TNT's recovery from the cyberattack, we have seen an accelerated shift of our product mix to more freight than parcel, putting pressure on our system and of course our costs."

84.     On the same call, Defendant Graf revealed that the integration of TNT was not progressing at the previously touted pace due to, in part, "a change in service mix following the NotPetya cyberattack." Defendant Graf additionally alerted investors that the TNT Income Improvement Target was no longer achievable, stating in pertinent part:

> The timing and amount of integration expenses and capital investments in any future period may change as we continue to execute the integration of TNT. We expect to realize the benefits of the TNT acquisition that were anticipated when the company was acquired, ***although at a more moderate pace caused by reductions in base business levels due to increasing economic weakness during the second***

***quarter and a change in service mix following the NotPetya cyberattack. As a result, we now expect the operating profit improvement goal of $1.2 billion to $1.5 billion for Express over fiscal year '17 will not be realized in FY '20.***

85.     On this news, FedEx stock dropped $22.50 per share, or roughly 12.2%, to close at $162.51 per share on December 19, 2018.

86.     Following FedEx's December 19, 2018 disclosure, analysts drastically slashed their price targets due to the Company's disappointing revelations related to the TNT integration and post-Cyberattack remedial measures, and voiced heightened skepticism at the Company's ability to successfully integrate TNT. In addition, certain analysts questioned whether Company Executives intentionally chose to maintain guidance on the TNT Income Improvement Target, thereby misleading investors.

87.     For example, on December 19, 2018, Barclays issued a report entitled **"The TNT Mirage"** lowering FedEx's price target and voicing frustration at "the rapid change in management guidance regarding the supposed profit potential of TNT." The analyst further stated:

> Despite nearly a year of lagging Express segment results following the complete operational shutdown of TNT from a computer virus (missed our margin expectations 4 out of the last 5 quarters), FedEx management until today clearly articulated to the investor community that: 1) TNT was fully operational following the cyberattack; and 2) aggressive profit improvement plans were "confidently" on track . . . . ***While we think Express results following the cyberattack clearly indicated mix recovery challenges in the TNT business, management chose to maintain guidance until today's cut.*** Perhaps this analyst will be less trusting of management commentary going forward.

(Emphasis added).

88.     Deutsche Bank also issued a report entitled "F2Q First Look . . . Bad," which criticized Defendants' lack of transparency with regards to TNT: "*The commentary around Europe is not very satisfying, as it likely reflects significant underperformance at TNT, on which Mgmt. is still not offering necessary details (we believe TNT volumes are more heavily* skewed towards

larger, palletized freight, as opposed to parcel, making the read-through to other global package-delivery companies less meaningful, in our view)."

89.    Following the market's realization that FedEx had not been truthful about issues it faced, on June 26, 2019, a securities class action entitled *Rhode Island Laborers' Pension Fund v. FedEx Corporation,* 19-cv-05990 was filed in the United States District Court for the Southern District of New York asserting that the statements alleged above were materially false and misleading during a class period of September 19, 2017 through December 18, 2018.

90.    As a result of the Defendants' misconduct, the Company and its shareholders have been significantly damaged.

91.    FedEx is subject to a securities class action that asserts that the statements referenced above were materially false and misleading as they failed to disclose and/or misrepresented the following adverse facts which were known to the Defendants that issued them or recklessly disregarded by them: that they failed to disclose and/or misrepresented the following adverse facts which were known to Defendants or recklessly disregarded by them: (i) TNT's overall package volume growth was slowing as TNT's large customers permanently took their business  to competitors after the Cyberattack; (ii) as a result of the customer attrition, TNT was experiencing an increased shift in product mix from higher-margin parcel services to lower-margin freight services; (iii) the anticipated costs and timeframe to integrate and restore the TNT network were significantly larger and longer than disclosed; (iv) FedEx was not on track to achieve the TNT Income Improvement Target; and (v) as a result of these undisclosed negative trends and cost issues, FedEx's positive statements about TNT's recovery from the Cyberattack, integration into FedEx's legacy operations, customer mix, customer service levels, profitability, and prospects lacked a reasonable basis.

### A.    Materially False and Misleading Proxy Statements

92.     On August 14, 2017, FedEx filed a Schedule 14a, which contained a Notice of

Shareholder Meeting (By order of the Board of Directors) and Proxy Statement (the "2017 Proxy

Statement").

93.     The 2017 Proxy Statement contains a summary which states in part:

> FedEx's strong and independent Board of Directors effectively oversees our
> management and provides vigorous oversight of FedEx's business and affairs in
> support of our mission of producing superior financial returns for our shareowners
> by providing high value-added logistics, transportation and related business
> services through focused operating companies.

94.     The 2017 Proxy Statement also makes the following statement regarding its

Corporate Governance Guidelines:

> The Board believes that FedEx's Bylaws and Corporate Governance Guidelines
> help ensure that strong and independent directors will continue to play the central
> oversight role necessary to maintain FedEx's commitment to the highest quality
> corporate governance.,

95.     The above statements were materially false and misleading because in fact, at least

with respect to disclosure made by management to the investing public, including stock analysts,

the Board of Directors did not effectively oversee management and provide vigorous oversight of

FedEx's business and affairs and FedEx does not have effective Corporate Governance Guidelines

because the Board did not have controls in place to provide assurance that management will have

a reasonable basis for all statements it makes to stock analysts concerning FedEx's business,

outlook and status of integration of new businesses.

96.     On August 13, 2018, FedEx filed a Schedule 14a, which contained a Notice of

Shareholder Meeting (By order of the Board of Directors) and Proxy Statement (the "2018 Proxy

Statement").

The 2018 Proxy Statement contains a summary which states in part: FedEx's strong and

independent Board of Directors effectively oversees our management and provides vigorous oversight of FedEx's business and affairs in support of our mission of producing superior financial returns for our shareowners by providing high value-added logistics, transportation and related business services through focused operating companies.

97.     The 2018 Proxy Statement also makes the following statement regarding its Corporate Governance Guidelines:

The Board believes that FedEx's Bylaws and Corporate Governance Guidelines help ensure that strong and independent directors will continue to play the central oversight role necessary to maintain FedEx's commitment to the highest quality corporate governance.,

98.     The above statements were materially false and misleading because in fact, at least with respect to disclosure made by management to the investing public, including stock analysts, the Board of Directors do not effectively oversee management and provide vigorous oversight of FedEx's business and affairs and FedEx does not have effective Corporate Governance Guidelines because the Board did not have controls in place to provide assurance that management will have a reasonable basis for all statements it makes to stock analysts concerning FedEx's business, outlook and status of integration of new businesses.

99.     On August 12, 2019, FedEx filed a Schedule 14a, which contained a Notice of Shareholder Meeting (By order of the Board of Directors) and Proxy Statement (the "2019 Proxy Statement").

100.     The 2019 Proxy Statement contains a summary which states in part:

FedEx's strong and independent Board of Directors effectively oversees our management and provides vigorous oversight of FedEx's business and affairs in support of our mission of producing superior financial returns for our shareowners by providing high value-added logistics, transportation and related business services through focused operating companies.

101.     The 2019 Proxy Statement also makes the following statement regarding its Corporate Governance Guidelines:

The Board believes that FedEx's Bylaws and Corporate Governance Guidelines help ensure that strong and independent directors will continue to play the central oversight role necessary to maintain FedEx's commitment to the highest quality corporate governance.

102.     The above statements were materially false and misleading because in fact, at least with respect to disclosure made by management to the investing public, including stock analysts, the Board of Directors do not effectively oversee management and provide vigorous oversight of FedEx's business and affairs and FedEx does not have effective Corporate Governance Guidelines because the Board did not have controls in place to provide assurance that management will have a reasonable basis for all statements it makes to stock analysts concerning FedEx's business, outlook and status of integration of new businesses.

## **DERIVATIVE AND DEMAND ALLEGATIONS**

103.      Plaintiff brings this action derivatively in the right and for the benefit of FedEx to redress the breaches of fiduciary duty and other violations of law by Defendants.

104.     Plaintiff will adequately and fairly represent the interests of FedEx and its stockholders in enforcing and prosecuting its rights.

105.     Plaintiff was a stockholder of FedEx common stock at the time of the wrongdoing of which Plaintiff complains and has continuously been a stockholder since.

106.     Because any such effort would have been futile, as set forth below, Plaintiff did not make a demand on the Board.

107.     This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

108.     At the time this action was filed, FedEx's Board of Directors consisted of the following members: Edwardson, Ellison, Jabal, Jackson, Martin, Ramo, Schwab, Smith, Steiner and Walsh.

109.     Because of their advisory, executive, managerial, and directorial positions with FedEx, each of the Defendants had knowledge of material non-public information regarding FedEx and were directly involved in FedEx's operations at the highest levels. Pursuant to FedEx Corporate Governance Guidelines,[3] the Board is obligated to "to promote the best interests of the Company and its stockholders by overseeing the management of the Company's business and affairs. In doing so, Board members have two basic legal obligations to the Company and its stockholders: (a) the duty of care; and (b) the duty of loyalty.  The Corporate Governance Guidelines prescribe: "The Board of Directors is responsible for monitoring the Company's compliance with legal and regulatory requirements and overseeing the Company's corporate integrity and compliance programs."

110.     The Director Defendants were directors throughout the time of the issuance of the materially false and misleading statements referenced above, and as such had a fiduciary duty to ensure that the Company's disclosures and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.  Each of the Director Defendants breached that duty and are liable for such action and inaction and therefore would not be able to independently assess any demand made.

111.     Plaintiff has not made a demand on the Board of Directors to bring the causes of action alleged herein because such a demand would be futile. FedEx's Board of Directors is unable

---

[3] http://investors.fedex.com/governance-and-citizenship/policies/governance-guidelines/default.aspx

to make an impartial determination as to whether to institute legal proceedings to redress the wrongdoing alleged herein because a majority of its members: (1) face a substantial likelihood of liability for non-exculpated breaches of their fiduciary duties to the Company through their participation or acquiescence in the wrongdoing alleged herein, complete failure to perform their oversight duties, and failure to ensure the Company's compliance with legally mandated disclosure standards; and/or (2) are not independent from members of FedEx's Board of Directors who face a substantial likelihood of liability. In fact, each of them shares responsibility for the materially false and misleading statements in the 2017, 2018 and 2019 Proxy Statements and the omissions of material fact contained therein.

112.    The Insider Selling Director Defendants sold FedEx stock while in possession of non-public materially adverse information about the prospects for FedEx's business and used that information to benefit themselves. Because the Insider Selling Director Defendants, consisting of five of the directors who would have to consider any demand made face a substantial liability for breach of their fiduciary duties of loyalty in connection with the sales of stock, any demand upon them would be futile.

113.    The IT Oversight Committee Defendants, as members of the IT Oversight Committee, recklessly authorized, permitted or failed to act to prevent FedEx to issue materially false and misleading statements, and failed to timely correct any materially false and misleading statements made. The IT Oversight Committee Charter provides that the IT Oversight Committee Defendants are responsible for "assess[ing] whether the Company's IT programs effectively support the Company's business objectives and strategies." Further, the IT Oversight Committee Defendants are responsible for "assist[ing] Board oversight of cybersecurity risks and management efforts to monitor and mitigate those risks."

32

114.     Thus, the IT Oversight Committee Defendants were responsible for understanding the extent of the future impact of the Cyberattack on FedEx's finances ensuring that the Company not make misleading statements regarding the Cyberattack or to omit to disclose materials facts when addressing the Cyberattack and its impact on the Company's business.

115.     Through their knowledge or reckless disregard, the IT Oversight Committee Defendants caused the improper statements made by the Company. Accordingly, the IT Oversight Committee Defendants breached their fiduciary duties of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the IT Oversight Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties, so any demand upon them is futile.

### A     Defendant Smith Lacks Independence

116.     Any demand made on Defendant Smith would be futile for other reasons as well. Defendant Smith is the founder of the Company and has served as a director, Chairman of the Board and CEO of the Company since 1998 and as Chairman of FedEx Express since 1975. Previously, Defendant Smith served as the President of the Company from 1998 to 2017, as a director, Chairman of the Board, President and CEO of FedEx Express from 1983 to 1998, as CEO of FedEx Express from 1977 to 1998, and as President of FedEx Express from 1971 to 1975. In 2018, Smith had a base salary of $1,384,820. In addition he received a targeted additional payout of 165% of his base salary plus a very substantial grant of stock options. Defendant Smith is, therefore, incapable of acting independently and demand is futile upon him.

**B**    **Substantial Likelihood of Liability for the Entire Board of Directors**

117.    The Defendants acted in bad faith by breaching their fiduciary duties in failing to adequately manage the Company, which has severely and negatively impacted the Company's financial condition and future prospects.

118.    By failing to satisfy their fiduciary duties, Defendants caused irreparable reputational harm to the Company, exposing the Company to millions of dollars of liability in securities class action lawsuits plus very substantial attorney's fees and expenses. The securities class action pending alleges that spokespersons for FedEx made numerous materially misleading statements to the investment community including numerous stock analysts in 2017 and 2018 regarding resolution of a hacking issue with the TNT subsidiary and its impact on FedEx being able to reach certain financial goals.

119.    Each Director Defendant had a duty to diligently ensure that there were procedures in place so that officers who spoke on behalf of the Company would not make statements that were materially false and misleading, including, but not limited to, information regarding the Company's business, its performance, its integration of TNT, and the veracity of the Company's financial disclosures. It was the duty of the Defendants to properly evaluate this information and provide thorough guidance and governance to the Company. Defendants failed in these duties. Defendants who sat on the Board either evaluated this information and intentionally or recklessly failed to put procedures in place to prevent the disclosure of materially false and misleading statements or failed to ensure the disclosure of information necessary to prevent the statements from being materially false and misleading.

120.    Each Director Defendant also had a duty to properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making

accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times.

121.    Each Director Defendant also had a duty to remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws.

122.    Each Director Defendant faces a substantial likelihood of liability in this action because of his or her failure as a director to ensure that reliable systems of controls were implemented and functioning effectively to prevent the Company from issuing materially misleading statements. Based on the size, scope, and blatancy of the wrongdoing, the Defendants must have known, or were reckless or grossly reckless in not knowing, that the statements disseminated during the Relevant Period were materially misleading, and/or Defendants, who are board members must have omitted material information necessary to prevent the statements from being materially misleading. Accordingly, the Defendants who are board members face substantial exposure to liability for their total abrogation of their duty of oversight. Because each of the Defendants who are board members faces a substantial likelihood of liability for unexculpated breaches of duty, demand is excused.

123.    Based on the Board's conduct, and its failure to take action against any wrongdoer, no FedEx shareholder would reasonably believe the Board would respond properly to a demand in good faith. Thus, demand is excused.

124.    Thus, this stockholder derivative action should be allowed to proceed.

## COUNT I

**Against Defendants Edwardson, Ellison, Jabal, Jackson, Martin, Ramo,
Schwab, Smith, Steiner, Walsh, Barksdale and Inglis for Violations of
Section 14(a) of the Securities Exchange Act of 1934**

125.     Plaintiff incorporates by reference and re-alleges each and every allegation set
forth above, as though fully set forth herein.

126.     The Section 14(a) Exchange Act claim alleged herein is based solely on
negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the
Director Defendants charged. The Section 14(a) Exchange Act claim alleged herein does not allege
and does not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any
allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this
non-fraud claim.

127.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall
be unlawful for any person, by use of the mails or by any means or instrumentality of interstate
commerce or of any facility of a national securities exchange or otherwise, in contravention of
such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public
interest or for the protection of investors, to solicit or to permit the use of his name to solicit any
proxy or consent or authorization in respect of any security (other than an exempted security)
registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

128.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that
no proxy statement shall contain "any statement which, at the time and in the light of the
circumstances under which it is made, is false or misleading with respect to any material fact, or
which omits to state any material fact necessary in order to make the statements therein not false
or misleading." 17 C.F.R. § 240.14a-9.

Case 1:19-cv-08723   Document 1   Filed 09/19/19   Page 37 of 44

129.    Under the direction and watch of the Director Defendants, the 2017, 2018 and 2019 Proxy Statements failed to disclose : (1) that certain of the Defendants had made materially false and misleading statements regarding the integration of TNT; (2) that FedEx had insufficient internal controls in place to prevent its officers from making statements to the investing public including analysts which had no basis in fact, and (3) as a result of the foregoing, certain of FedEx's public statements, as set forth above, were materially false and misleading.

130.    The Director Defendants also caused the 2017, 2018 and 2019 Proxy Statements to be materially false and misleading with regard to failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated.

131.    Moreover, the 2017, 2018 and 2019 Proxy Statements were false and misleading in discussing the Company's adherence to specific governance policies and procedures, including the Code of Ethics and Corporate Governance Guidelines, due to the Individual Defendants' failure to abide by them and making and or permitting the Company to make the false and misleading statements and omissions of material fact referenced herein.

132.    In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 and 2018 Proxy Statements were materially false and misleading.

133.    The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017, 2018 and 2019 Proxy Statements, including election of directors and ratification of the appointment of an independent registered public accounting firm.

134.    The materially false and misleading elements of the 2017, 2018 and 2019 Proxy Statements led to the election, re-election or will lead to the re-election of Defendants Edwardson, Ellison, Jabal, Jackson, Martin, Ramo, Smith, Steiner, Walsh, Barksdale and Inglis which allowed them to continue breaching their fiduciary duties to FedEx at least until December 18, 2018, except with respect to Barksdale after his retirement from the Board.

135.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2017, 2018 and 2019 Proxy Statements.

136.    Plaintiff on behalf of FedEx has no adequate remedy at law.

## COUNT II

**Against All Defendants Derivatively for Contribution
Under §§10(b) and 21D of the Exchange Act
Against the Securities Action Defendants**

137.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

138.    This claim is brought derivatively on behalf of the Company for contribution and indemnification against Defendants Smith, Graf, Bronczek, Subramaniam, Cunningham, Colleran and Lenz (the "Securities Class Action Defendants"), each of whom are named as defendants in the Securities Class Action.

139.    FedEx is named as a defendant in the Securities Class Action, which asserts claims under the federal securities laws for violations of §10(b) of the Exchange Act. If FedEx is ultimately found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omission of some or all of the Securities Class Action Defendants as alleged herein.  The Company is entitled to receive

contribution from those defendants in connection with the Securities Class Action against the Company.

140.    As directors and/or officers of FedEx, the Securities Class Action Defendants had the power and/or ability to, and did, directly or indirectly control or influence the Company's business operations and financial affairs, including the content of public statements about FedEx, and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

141.    The Securities Class Action Defendants are also liable under §10(b) of the Exchange Act, 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and §21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

142.    Accordingly, FedEx is entitled to all appropriate contribution or indemnification from the Securities Class Action Defendants, who are responsible for exposing FedEx to liability under the federal securities laws.

## COUNT III

### Against All Defendants for Breach of Fiduciary Duties

143.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

144.    As alleged in detail herein, each of the Defendants had a fiduciary duty to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority, and when put on notice of

problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

145.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, FedEx has sustained and will continue to sustain significant damages, in that FedEx has significant monetary exposure to the pending securities class action and will incur significant attorney's fees and expenses that it would not have incurred but for the misconduct of the FedEx has also suffered and will continue to suffer as a result of the loss of reputation to its corporate image and goodwill.

146.    Plaintiff has no adequate remedy at law.

### COUNT IV

**Against The Insider Trading Defendants for Insider Trading and
Misappropriation of Information Belonging to Fed Ex**

147.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

148.    At the time each of the Insider Trading Defendants sold his or her FedEx stock as set forth above, he or she knew the material, non-public information described above, and sold FedEx stock on the basis of such information.

149.    The information upon which the Insider Trading Defendants based their decision to sell was proprietary, non-public information concerning the Company's business operations, financial condition, and growth prospects. It was a proprietary asset belonging to the Company, which each of the Insider Trading Defendants misappropriated to his or her own benefit when he or she sold personal holdings in FedEx stock. Each of the Insider Trading Defendants knew that this information was not intended to be available to the public. Had such information been

generally available to the public, it would have significantly reduced the market price of FedEx stock at the time of such sales.

150.    The Insider Trading Defendants' sale of FedEx stock while in possession and control of this material, adverse, non-public information was a breach of his or her fiduciary duties of loyalty and good faith. Each of the Insider Trading Defendants is therefore liable to FedEx for insider trading.

151.    Since the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties of the Insider Trading Defendants, the Company is entitled to the imposition of a constructive trust on any profits such Insider Trading Defendants obtained thereby.

152.    Plaintiff, on behalf of FedEx, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Waste of Corporate Assets

153.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

154.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Securities Class Action that they brought on with their improper statements. In addition, due to the Individual Defendants' mismanagement, the Company has been forced to interrupt its business and dedicate its resources and attention to restating and revisiting its past financial statements.

155.    As a result of the decision to allow the Company to operate in an environment devoid of adequate internal and financial controls, the Individual Defendants have caused FedEx

to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

156.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

157.    Plaintiff, on behalf of FedEx, has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Unjust Enrichment

158.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

159.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of FedEx and its shareholders.

160.    Plaintiff, as a stockholder and representative of FedEx, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

161.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

a.    Declaring that Plaintiff may maintain this action on behalf of FedEx, and that Plaintiff is an adequate representative of the Company;

b.    Against all Defendants, jointly and severally, and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

c.      Directing FedEx to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, including the federal securities law  and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

d.      Creating a constructive trust for the benefit of FedEx with the profits gained by the Insider Trading Defendants as a result of their sale of FedEx stock while in possession of non-public materially adverse information;

e.      Awarding to FedEx restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

f.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

g.      Granting such other and further relief as the Court deems just and proper.

September 19, 2019

LEVI & KORSINSKY, LLP

By:  /s/Mark Levine
Mark Levine (mlevine@zlk.com)
Eduard Korsinsky (ek@zlk.com)
Gregory Nespole (gnespole@zlk.com)
55 Broadway, 10th Floor
New York, NY 10006
(212) 363-7500 (phone)
(212) 363-7171 (fax)

Attorneys for Plaintiff

**VERIFICATION**

      I, Salvatore Tagliareni, under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Signed:

Print Name: salvatore tagliareni           Date: 09/13/19